IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DWAYNE THOMAS                                                                    PLAINTIFF

v.                                                      CIVIL ACTION NO. 4:22-CV-124-SA-JMV

LOUIS WHITE AND DAVID ADAMS,
in their individual capacities                                                  DEFENDANTS

ORDER AND MEMORANDUM OPINION

Dwayne Thomas initiated this civil action by filing his Complaint [1] on August 5, 2022. He brings excessive force claims under 42 U.S.C. § 1983 against Greenville police officers Louis White and David Adams, in their individual capacities ("the Defendants"). The Defendants have filed a Motion for Summary Judgment [49] seeking dismissal of the claims against them. The Motion [49] has been fully briefed and is ripe for review. The Court is prepared to rule.

*Relevant Factual and Procedural Background*

On August 7, 2019, Thomas appeared in Greenville Municipal Court on misdemeanor charges of simple assault and disturbing the peace. He and his wife Katrina Thomas were sitting in the back left corner of the courtroom when Officer White and Officer Dominque Tucker approached him and asked him to come over to the right side of the courtroom. The officers apparently had a warrant for Thomas' arrest for burglary and intended to arrest him in a separate area of the courtroom.[1]

Thomas stood up and began to walk toward the right side of the courtroom with Officers White, Tucker, and Adams walking closely by him. Several other officers were in Thomas' vicinity as well.

---

[1] The warrant was signed that morning—August 7, 2019.

At his deposition, Thomas testified that he did not remember the first thing the officers said to him, but he indicated that they never advised him of the warrant for his arrest. He alleged that when they began moving towards the other side of the courtroom, the way the officers were around him made him feel "real funny," so he asked them what was going on and told them not to put their hands on him because he was taking heart medication. [53], Ex. 1 at p. 9. According to Thomas, after saying only those words to the officers, Officer White placed him in chokehold from behind. Thomas testified that as he tried to get loose from the chokehold, he fell forward onto his stomach and White fell on top of him.

According to Thomas, while he was on the ground, he remained on his stomach with his hands behind his back, and he did not punch, kick, or resist the officers. However, he cussed at them, wiggled to try to get loose from the chokehold, and told White, "You killing me. You killing me. You killing me." *Id.* at p. 29.[2]

Thomas testified that Officer White kept him in a chokehold for 10-15 seconds and rendered him unconscious. Thomas alleged that while Officer White choked him, Officer LeShaun McWright (an officer who knew Thomas personally) entered the courtroom and told Officer White to let Thomas go, but White refused to release his hold on Thomas.[3] Thomas further testified that Officer Adams struck him in the head while he was unconscious.[4]

---

[2] At his deposition, Thomas was asked, "How were you wiggling? Were you going left to right?" and he responded, "I was moving and telling him, I was like 'You killing me. You killing me.'" [53], Ex. 1 at p. 29.

[3] At his deposition, Thomas alleged that in the 10-15 seconds he was in the chokehold, his wife exited the courtroom to call his mother, and she saw Officer McWright while she was outside. McWright asked what was going on and accompanied her back into the courtroom where he began trying to get Officer White off of Thomas' back.

[4] At his deposition, Thomas testified that his wife informed him that Officer Adams struck him in the head while he was unconscious.

According to Thomas, when he regained consciousness, he was in handcuffs and bleeding from his nose and mouth. He asserted that Officer McWright and District Attorney Eric Hawkins began to tend to him while someone called for the paramedics. Thomas alleged that Hawkins poured water on his face and in his mouth, and McWright accompanied him in the ambulance to the hospital. As he rode to the hospital, he was placed on oxygen and given an IV.

Thomas further testified that when at the hospital, a supervising officer named Patsy arrived, instructed the officers to take the handcuffs off of him, and told the officers that she would not "take the [hit]" for them. *Id.* at 34.

Thomas remained in the intensive care unit ("ICU") for three days. He testified that he was unable to move his feet, had bloodshot eyes, and had heart and breathing trouble. Thomas alleged that he sought treatment from an eye doctor the day after leaving the hospital.

The Defendants dispute virtually every aspect of Thomas' version of events. At his deposition, Officer White testified that on the day in question, Officer Tucker informed him that she had a warrant for Thomas' arrest for burglary. Officer White asserted that he told Officer Tucker he would gather officers to assist with the arrest because of how Thomas acts when he is arrested. He explained that he was familiar with Thomas from his previous work serving warrants, responding to calls initiated by other officers, and approving reports written by other officers.

Officer White testified that he and Officer Tucker approached Thomas and asked him to come over and talk to them for a minute. Officer White alleged that as Thomas walked with them to the other side of the courtroom, Thomas asked them what was going on, and White and Tucker both informed him that they had a warrant for his arrest. Officer White testified that when Thomas denied having a warrant, Officer Tucker told him to "come on and talk with us," to which Thomas responded, "I ain't going no motherfucking where." [53], Ex. 2 at p. 11. According to Officer

White, Officer Tucker then put her hand on Thomas' back and attempted to usher him forward, and Thomas shoved her, causing her to nearly lose her footing. Officer Adams (who was walking closely behind White and Tucker) testified that Thomas was irate and stated, "That's that bitch there," before lunging at Officer Tucker. [53], Ex. 3 at p. 3, 8.[5]

Both Officer White and Officer Adams testified that Adams then bear-hugged Thomas and took him down to the floor. According to White, Thomas was now on his back on the floor kicking, flopping, and cursing. Officer White testified that multiple other officers began yanking at Thomas' arms and legs, trying to turn him over and telling him to stop resisting. Officer White alleged that he instructed another officer to turn Thomas' leg so that Thomas would turn onto his side and he could put Thomas in a neck restraint (a technique that is apparently safer than a chokehold). According to White, the officer turned Thomas' leg too fast, causing him to roll onto his stomach and preventing White from placing him in a neck restraint.

Officer White testified that after Thomas' body was turned over, he laid on Thomas' back. The officers had one of Thomas' arms under control.[6] However, according to White, Officer Adams then indicated that Thomas was trying to get his gun, and White made the decision to put Thomas in a chokehold.[7] Officer White alleged that he did not want to use the chokehold—he later

---

[5] In the Defendants' Responses to the Plaintiff's Requests for Admission, Defendants' Response No. 6 states that "[Thomas] was charged with Simple Assault on Police Officer by Investigator Dominique Tucker," but there is no further evidence in the record regarding this charge or its disposition. [53], Ex. 7 at p. 2.

[6] Officer White testified that when Thomas was turned over, the officers took control of one of his arms. Officer White later testified that when he placed Thomas in a chokehold, one of his arms was pinned underneath him. In disputing the officers' version of events, Thomas contends that if the officers held one of his arms and his other arm was underneath him, he would not have had an available arm to reach for Officers Adams' gun. *See* [54] at p. 6.

[7] In his Response Memorandum [54], Thomas emphasizes that Officer White's incident report does not state that White placed Thomas in a chokehold (the incident report refers to a "neck restraint") or that Thomas reached for Officer Adams' gun. *See* [53], Ex. 6.

testified that chokeholds are dangerous and against department policy—but he felt he needed to use the chokehold after Adams stated that Thomas was going for his gun.

Officer White testified that when he first applied the chokehold, the other officers began yanking the arm that was under Thomas, and he told them to stop and that he would tell them when to handcuff Thomas. About this time, according to Officer White, Officer McWright approached the officers and began saying, "Let him go. I got him." *Id.* at p. 25. Officer White felt that McWright "was basically saying, 'I can get through to him.'" *Id.* But White responded by cussing at McWright and telling him, "We past that." *Id.*

According to Officer White, as soon as Thomas stopped "bucking," he told the officers to handcuff him. *Id.* at p. 26. He testified that he released the chokehold as soon as he instructed the officers to handcuff Thomas, and he got off of Thomas' back after they handcuffed him. When asked how he knew it was okay to release the chokehold and handcuff Thomas, Officer White testified that Thomas "stopped doing everything he was doing," but he insisted that Thomas never lost consciousness. *Id.* at p. 27.

In his Complaint [1], Thomas asserts that Officers White and Adams violated his Fourth Amendment right to be free from excessive force. In the present Motion [49], the Defendants contend that they are entitled summary judgment based on qualified immunity. Thomas opposes the Motion [49].

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

## Analysis and Discussion

As noted, the Defendants contend that they are entitled to summary judgment based on qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Crane v. City of Arlington, Tex.*, 50 F.4th 453, 463 (5th Cir. 2022) (citing *Mullenix v. Luna,* 577 U.S. 7, 11, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)). "Once a defendant properly pleads qualified immunity, the burden of proof shifts to the plaintiff

to negate the defense." *Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) (citing *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016)). To satisfy this burden, the plaintiff must establish: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (citing *Gibson v. Kilpatrick*, 773 F.3d 661, 666 (5th Cir. 2014)).

The Court begins with whether Thomas has created a question of fact as to a constitutional violation.

### I. Fourth Amendment – Excessive Force

Thomas alleges that Officers White and Adams violated his Fourth Amendment right to be free from excessive force during a seizure. "[E]xcessive force claims arising from an arrest or investigatory stop invoke the protection provided by the Fourth Amendment . . . against 'unreasonable seizure.'" *Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir. 2021). "Fourth Amendment jurisprudence, however, has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2 443 (1989)). "Thus, determining whether the force used to effect a particular seizure is 'reasonable' for purposes of the Fourth Amendment requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake." *Id.*

"To prevail on a Fourth Amendment excessive force claim, a plaintiff must show '(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Craig*, 49 F.4th at 409 (citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). Courts generally consider the second and third elements together, "as officers must assess not only the need for force, but also the

relationship between the need and the amount of force used." *Solis v. Serrett*, 31 F.4th 975, 982 (5th Cir. 2022) (citing *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)) (internal quotation marks omitted).

"Excessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Craig*, 49 F.4th at 409 (*Deville*, 567 F.3d at 167). *Graham* identifies "three non-exclusive considerations for courts to examine when analyzing the reasonableness of the force used, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Solis*, 31 F.4th at 382) (citing *Graham*, 490 U.S. at 396, 109 S. Ct. 1865).

"Importantly, '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Tucker*, 998 F.3d at 171 (citing *Graham*, 490 U.S. at 396, 109 S. Ct. 1865). "'[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (citing *Graham*, 490 U.S. at 396, 109 S. Ct. 1865). "Instead, 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* at 171 (citing *Graham*, 490 U.S. at 396-97, 109 S. Ct. 1865). "[T]he overarching question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (citing *Graham*, 490 U.S. at 397, 109 S. Ct. 1865).

As noted above, the parties present two entirely different factual accounts of what occurred on August 7, 2019. Therefore, at the outset of its analysis, the Court emphasizes that "[t]he

plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment." *Craig*, 49 F.4th at 409.

A.  *Injury*

First, Thomas must show an injury that resulted directly from the officers' alleged excessive force. *See id.* The Defendants argue that Thomas' alleged injuries are too minor to render their conduct objectively unreasonable. In the 2022 case of *Solis v. Serrett*, the Fifth Circuit explained the injury element (and its interrelatedness to the excessiveness and reasonableness elements) as follows:

> Generally, to maintain a claim for excessive force, a plaintiff need not demonstrate a significant injury, but the injury must be more than *de minimis*. *See Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). Recently, this circuit has characterized the injury requirement as "a sliding scale, not a hard cutoff." *Buehler*, 27 F.4th at 982. This approach treats the degree of injury—even if minor— as interrelated to the reasonableness and excessiveness of the officer's force. "[A]lthough a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (alteration in original) (quoting *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013)). Accordingly, "[a]ny force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Id.* (quoting *Brown*, 524 F. App'x at 79). In other words, "as long as a plaintiff had suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.* (quoting *Brown*, 524 F. App'x at 79). This means that if the officer's force was unreasonably excessive, Solis need only show "some injury"—a bar which she clears here.

31 F.4th at 981-82; *see, e.g., Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (minor bleeding and hip pain were sufficient to sustain excessive force claim where officer's use of force was objectively unreasonable).

"Because 'qualified immunity claims should be addressed separately for each individual defendant,'" the Court addresses alleged injuries attributable to each officer separately. *Westfall v. Luna*, 903 F.3d 534, 549-550 (5th Cir. 2018) (separately considering injuries caused by each officer) (citation omitted).

     *i.   Officer Adams*

As noted, Thomas alleges that Officer Adams struck him in the side of the head. At his deposition, Thomas testified that the only contact Adams ever made with him was the strike. *See* [53], Ex. 1 at p. 19. Thomas additionally testified as follows:

> A.     He struck me on the right side of my head. ((Indicating.))
>
> Q.     On the right side of your head?
>
> A.     Yes, sir.
>
> Q.     Okay. Did it injure you in any way?
>
> A.     It didn't injure me because I had passed out. I didn't really know what was going on.

[49], Ex.1 at p. 13.

The Defendants argue that this testimony defeats Thomas' excessive force claim, asserting that it is a concession that Thomas did not suffer an actual injury from the strike. The Court disagrees. Thomas testified that he was "passed out" during the strike and did not know what was going on. *Id.* He testified that his wife was the one who informed him that Officer Adams' struck him. *Id.* He later testified that he was bleeding from his nose and mouth when he regained consciousness, but he seemed unsure about the cause of the bleeding:

> Q.     Okay. So your testimony is that your mouth and nose started bleeding because of the choke?
>
> A.     Yes, he was choking me.

> Q.    Okay. And so the choking around your neck is what caused your mouth and nose to bleed?
>
> A.    *I guess so.*

*Id.* at p. 17 (emphasis added).

Viewing Thomas' testimony in the light most favorable to him, a reasonable jury could conclude that Thomas was unsure about what injuries the strike may have caused because he was allegedly unconscious at the time of the strike. As such, a reasonable jury could conclude that Officer Adams' strike caused Thomas "some injury." *Solis*, 31 F.4th at 982.

The Defendants argue that even if Thomas suffered an actual injury, the limited extent of Thomas' injuries tends to show that the use of force was objectively reasonable. The extent of Thomas' injuries allegedly attributable to Officer Adams is a question of fact to be resolved by a jury. However, the Court emphasizes that even if Adams' strike caused a minor injury, "insignificant injuries may support an excessive force claim, as long as they result from unreasonably excessive force." *Sam*, 887 F.3d at 713. Accepting Thomas' version of events as true, Officer Adams struck him in the head while he was unconscious with his hands behind his back. In context, a resulting minor injury would qualify as a legally cognizable injury sufficient to sustain an excessive force claim. *See Schmidt v. Gray*, 399 F. App'x 925, 928 (5th Cir. 2010) ("When we accept Schmidt's factual assertions as true—that Gray intentionally leaned him again against the car and then maliciously slammed the trunk lid on his finger in retaliation against Schmidt and not for any law enforcement purposes—the resulting pain, soreness, and bruising, combined and in context, qualify as a legally cognizable injury."); *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999) (insignificant injuries—"dizziness, loss of breath, and coughing"—caused by choking during malicious assault by a police officer were sufficient to assert constitutional violation).

11

ii. *Officer White*

Turning to the injuries allegedly attributable to Officer White, though the parties' factual accounts differ, the parties agree that Officer White choked Thomas. At his deposition, Thomas testified that he lost consciousness and felt like he was dying while he was being choked. He testified that when he regained consciousness, he was bleeding from his nose and mouth, Hawkins and McWright tended to him, someone called the paramedics, and he rode to the hospital hooked up to oxygen and an IV. He testified that while at the hospital, he remained in ICU for three days and then "moved . . . to a room," though he did not specify how many days he remained in the general ward. [53], Ex. 1 at p. 34.

When asked why he had to stay in the ICU for three days, Thomas responded that he could not move his feet, his eyes were bloodshot red, and he had heart and breathing trouble. Thomas attached two pictures to his deposition: one appears to show compression devices around his calves, the other is a picture of his bloodshot eyes. *See id.* at p. 40-41. Officer White testified at his deposition that he was familiar with petechial hemorrhaging, which he described as "when blood vessels burst in the eyes." [53], Ex. 2 at p. 28. He confirmed that he saw photographs showing petechial hemorrhaging in Thomas' eyes and testified that petechial hemorrhaging may be caused by "a person's oxygen supply being cut off," "straining really hard," "high blood pressure," or "anything that puts great pressure on the eyes." *Id.* at p. 29.

Thomas testified that he sought treatment from an eye doctor the day after he left the hospital. He asserted that he received a prescription for eye drops and that his eyes remained bloodshot for two weeks after the encounter. Thomas further testified that the eye doctor attributed his bloodshot eyes to the chokehold and asked him, "Who [was] trying to kill you[?]" [53], Ex. 1 at p. 36.

Like above, the Defendants assert that if Thomas did suffer an actual injury sufficient to satisfy the first element of an excessive force claim, his injuries are minimal because he testified that he was not diagnosed with a specific injury at the hospital and that X-rays revealed no fractures. Per the Defendants, Thomas' allegedly minimal injuries tend to support a conclusion that Officer White's use of force was reasonable.

First, Thomas' alleged injuries undoubtedly exceed the "some injury" threshold necessary to maintain an excessive force claim. *Cf. Solis*, 31 F.4th at 982 (general wrist and back pain satisfied "some injury" requirement).

Second, Thomas' alleged injuries are more significant than those typically characterized as minor injuries indicating a reasonable use of force. For example, in the 2018 case of *Westfall v. Luna*, following her arrest at approximately 3:00 a.m., the plaintiff was transported to the hospital where staff noted numerous abrasions and bruises, bloody urine, high blood pressure, and an increased heart rate. 903 F.3d at 541. The plaintiff was released from the hospital later that morning. *Id.* The Fifth Circuit concluded that plaintiff's injuries were *de minimis* and affirmed the district's court granting of qualified immunity on that basis. *Id.* at 550. Here, Thomas testified that the chokehold caused him heart and breathing trouble, similar to the plaintiff in *Westfall*. However, Thomas testified that he could not move his feet and remained in the ICU for three days and in the general ward for an additional unspecified period of time. In other words, Thomas remained in the hospital much longer and experienced more significant complications than the plaintiff with high blood pressure and an increased heart rate in *Westfall*. Thomas' alleged injuries are *not* insignificant injuries that suggest a reasonable use of force.

The Defendants' final argument relevant to the injury element relates to causation. At his deposition, Thomas testified that he began receiving medical treatment for heart problems and

blood pressure issues two years before the subject incident. Thus, according to the Defendants, Thomas cannot demonstrate a causal connection between his injuries and the officers' use of force.

"The eggshell skull rule is applicable in § 1983 excessive force cases." *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 728 (5th Cir. 2018) (citing *Dunn v. Denk*, 54 F.3d 248, 251 (5th Cir. 1995)). "According to the eggshell skull rule, 'a tortfeasor takes his victim as he finds him.'" *Id.* (citing *Dunn*, 54 F.3d at 251). Even assuming that Thomas' preexisting heart and blood pressure issues increased the risk that he would experience petechial hemorrhaging, circulatory issues in his feet, and other heart and breathing trouble following an incident where he was placed in a chokehold, laid on, and punched in the head, the evidence suggests that he would not have experienced these injuries had he not been subject to those actions. *See, e.g.,* [53], Ex. 1 at p. 35-36 (Thomas testified that he did not have trouble with his feet prior to this incident). Thomas has presented sufficient evidence as to causation for summary judgment purposes. *See Darden*, 880 F.3d at 728 (decedent's preexisting conditions increased his risk of death from tasing and therefore contributed to his death; however, plaintiff sufficiently demonstrated causation where evidence showed decedent would not have died had officers not tased him).

In summary, Thomas has produced enough evidence for a reasonable jury to conclude that he suffered injuries due to the actions of Officers White and Adams. Further, contrary to the Defendants' arguments, the extent of his alleged injuries, particularly in context, does not tend to suggest the officers acted reasonably.

### B. Amount of Force and Reasonableness

The Court next considers the amount of force used and the reasonableness of resorting to such force. *See Solis*, 31 F.4th at 982 (second and third elements generally considered together).

As noted above, "[e]xcessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Craig*, 49 F.4th at 409 (*Deville*, 567 F.3d at 167). In assessing reasonableness, the Court considers the following *Graham* factors: "the severity of the crime at issue," "whether the suspect poses an immediate threat to the safety of the officers or others," "and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 410.

"In determining whether the use of force was clearly excessive and clearly unreasonable, [the court] evaluate[s] each officer's actions separately, to the extent possible." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007)).

### i. Severity of Crime at Issue

Beginning with the severity of the crime at issue, neither party disputes that Officers White and Adams were attempting to execute a felony arrest warrant for burglary. *See* [49], Ex. D (arrest warrant for House Burglary in violation of MISS. CODE ANN. 97-17-23).[8] At his deposition, Officer White testified that when Officer Tucker informed him of the warrant, she told him Thomas "had a protection order against him; he violated it by doing a burglary." [53], Ex. 2 at p. 4. And Officer Adams testified at his deposition that White informed him of Thomas' felony arrest warrant. *See* [53], Ex. 3 at p. 2. In other words, the officers, particularly Officer White, were aware of the serious nature of the arrest warrant. *Cf. Frank v. Parnell*, 2023 WL 5814938, at *4 (5th Cir. Sept. 8, 2023)

---

[8] Thomas disputes that the officers *informed* him of the warrant for his arrest, but he does not dispute that they were attempting to execute a warrant at the time of the incident. The Defendants argue that there is no genuine dispute that the officers informed Thomas of the warrant for his arrest because Thomas testified that he "didn't hear what [the officers] were saying" and that "[t]hey was saying *something* and I was like, 'What's going on?'" [49], Ex. 1 at p. 10. However, Thomas specifically testified that he "didn't know" they were trying to serve a warrant and that no one told him they were trying to take him to a back room to serve the warrant. [53], Ex. 1 at p. 7-8, 18.

(finding first *Graham* factor neutral where officers were unaware of the specific nature of the felony warrant). This factor weighs in favor of the officers' use of force. *See Darden*, 880 F.3d at 729 (seriousness of suspected drug offense tipped first factor in favor of the officers).

*ii.* *Immediate Safety Threat*

Next, the Court considers whether Thomas posed an immediate safety threat to the officers or others. Accepting Thomas' version of events as true, he began to walk toward the other side of the courtroom as instructed by Officers White and Tucker. White, Tucker, and Adams walked closely by him. As he began walking with the officers, he asked them "What's going on?" and told them "Don't put your hands on me because I take medication." [53], Ex. 1 at p. 7. Thomas testified that those were the *only* statements he made prior to Officer White placing him in a chokehold:

> Q. So who was the first person that put – that made any kind of contact with you?
>
> A. Officer White is the first person that grabbed me, and he grabbed me from the back. And he had me in a chokehold so tight. I was trying to get loose from him and I couldn't get loose.
>
> Q. Okay. So your testimony is that while you were still standing that he grabbed you from behind your neck?
>
> A. Yes.
>
> Q. And that he was the first person that grabbed you?
>
> A. Yes, sir.
>
> Q. And that prior to that, you had not put your hands on any officer?
>
> A. I haven't [sic] touched anyone.
>
> Q. Okay. And, now, the only thing you had said to the officers prior to that was that you took heart medication and not to put their hands on you?

16

> A.     Yes, sir.

*Id.* at p. 9-10.

While Officers White and Adams testified that they used force against Thomas after he shoved Officer Tucker, Thomas adamantly denied that he did so:

> Q.     Okay. So if there are multiple officer statements that say people saw you push Officer Tucker, that is – every one of those are a lie?
>
> A.     I never pushed her.
>
> Q.     You never put your hands on her at all?
>
> A.     I never put my hands on her.

*Id.* at p. 16.

The Defendants further argue that the officers would have reasonably feared for their safety due to Thomas' size and their knowledge of his criminal history, including "his propensity to assault females." [50] at p. 6. Thomas is 6 feet 6 inches and weighed 260 pounds at the time of the incident. He testified that Officer White is "significantly shorter" than him, though he also described White as a "big dude." [49], Ex. 1 at p. 8, 11.

As to Thomas' criminal history, he testified that he was previously convicted and incarcerated for a kidnapping and domestic violence incident involving a previous romantic partner who is the mother of some of his children. Officer White testified that he was familiar with Thomas from his previous work serving warrants, responding to calls initiated by other officers, and approving reports written by other officers. Officer Adams testified at his deposition that he recalled interacting with Thomas on one previous occasion, possibly a domestic violence call, but he could not remember the details of the call.

On the facts as recounted by Thomas, a jury could conclude that no reasonable officer in Officer White or Officer Adams' positions would have viewed Thomas as an "*immediate* threat to the safety of the officers or others." *Solis*, 31 F.4th at 982 (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. 1865). The Court is cognizant that Thomas' size and criminal history, if known to the officers, could reasonably impact their perception of the threat he may have posed. *See Francis v. Garcia*, 702 F. App'x 218, 222 (5th Cir. 2017) (finding officer reasonably believed that decedent posed a threat due to, *inter alia*, decedent's size and officer's knowledge of prior domestic-violence incident). However, taking as true Thomas' version of events, his behavior was non-threatening prior to being placed in a chokehold. He complied with the officers' request to walk with them to the other side of the courtroom. While they were moving to the other side of the courtroom, Officers White, Tucker, and Adams walked closely by Thomas and several other officers were in the vicinity.[9] In other words, Thomas was surrounded by police officers in the middle of the day in open court. Thomas alleged that he did not cuss at the officers, push Officer Tucker, or make more than the two referenced statements prior to being placed in a chokehold.

Further, under Thomas' version of events, at the point that Officer Adams allegedly struck Thomas in the head, he was on his stomach with his hands behind his back and surrounded by officers. Even if Thomas was wiggling and cussing after being placed in the chokehold, he was allegedly unconscious at the point Officer Adams struck him. [53], Ex. 1 at p. 29. A jury could conclude that at this point, a reasonable officer in Adams' position would not have viewed Thomas

---

[9] At his deposition, Thomas testified that there were "a lot more police. . . on the right-hand side of the benches." [53], Ex. 1 at p. 13. Officer White testified at his deposition that he recruited Officers Brassfield and McGonagill to help with the arrest. He testified that Officers Scott and McWright were present when Thomas was in a chokehold. Though it is unclear where the other officers were located during the interaction, the bottom line is that there were multiple other officers present in the courtroom with Officers White, Adams, and Tucker.

as an immediate safety threat. Though Thomas' size and criminal history somewhat detract from the weight of this factor, it ultimately weighs in favor of Thomas.

### iii. Resistance to Arrest

The third *Graham* factor is whether Thomas was "actively resisting arrest or attempting to evade arrest by flight." *Craig*, 49 F.4th at 410.[10] Thomas argues that he did not resist arrest before he was subjected to force. He asserts that at the time the officers exerted force against him, he was not advised that there was a warrant for his arrest, he was standing still and surrounded by several officers, and he "simply told them that he did not want to be touched because he was taking medications." [53] at p. 13.

The Defendants argue that "there is no *genuine* dispute that [Thomas] was actively resisting arrest. Specifically, [Thomas] admits that he cursed at Investigator Tucker when she approached him before the subject incident and at the other officers' multiple times during the incident, and that he told the officers 'don't put your hands on me' multiple times." [58] at p. 3 (emphasis in original).

The Court begins with the Defendants' argument that Thomas cussed *prior* to the officers' use of force. Pointing to Thomas' testimony that he did not know whether he told Officer Tucker, "Bitch, I'm going to get you," the Defendants contend that Thomas admitted to cussing at Tucker when she approached him *before* the subject incident. Regarding cussing at the officers, Thomas testified as follows:

> Q.    Okay. So you were completely compliant and they grabbed you by the neck and threw you on the ground for 20 seconds for no reason and you never resisted?
>
> A.    I never resisted.
>
> Q.    Okay. Did you ever curse the officers at all?

---

[10] Neither party argues Thomas was trying to flee. The Court will focus on resistance.

A.     Yep, I was doing a lot of cursing.

Q.     Okay. At what point did you curse them?

A.     I was cussing them and telling them to turn me loose, turn me loose, motherfucker, all this and that. And then I just –

Q.     But you never physically resisted, you just cussed them?

A.     I just was cursing. That's it.

. . .

Q.     Okay. Did you ever – do you deny calling Officer Tucker a bitch?

A.     I might have cussed her.

Q.     You don't contend that Officer Tucker put her hands on you, do you?

A.     No, she never touched me.

Q.     Why would you have called Officer Tucker a bitch?

A.     When I was on the ground, he still had me in the chokehold, and *that is when I went to cussing*.

Q.     Okay. I'm asking you, did you call the female officer a bitch?

A.     No.

. . .

Q.     Okay. Do you deny telling Officer Tucker, "Bitch, I'm going to get you"?

A.     I don't know.

Q.     You don't know whether you made that statement or not?

A.     I don't know.

Q.     All right. I just want to be crystal clear on this. If you were to testify in this case in court in front of a jury, you would

> tell the jury that you were just standing there, you were completely compliant, *you hadn't cussed the officers at all* and that they attacked you for no reason? That is what your testimony would be?
>
> A.   Yes.

[53], Ex. 1 at p. 15-16, 18-21 (emphasis added).

Accepting Thomas' version of event as true, he did not begin cussing at the officers until after Officer White began choking him. If he did cuss at Officer Tucker, he did so after he was placed in a chokehold. Again, according to his testimony above, the only thing Thomas said prior to being placed in a chokehold was "What's going on?" and "Don't put your hands on me because I take medication." [53], Ex. 1 at p. 7.

The Court now turns to the Defendants' argument that Thomas' "don't put your hands on me" statement (which he admittedly made prior to the use of force) constituted *active* resistance to arrest and therefore justified the use of force. "Officers may consider a suspect's refusal to comply with instructions…in assessing whether physical force is needed to effectuate the suspect's compliance. However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (quoting Deville, 567 F.3d at 167). As such, "where an individual's conduct amounts to mere '*passive resistance*,' use of force is not justified." *Id.* (quoting *Hanks v. Rogers*, 853 F.3d 738, 742 (5th Cir. 2017)) (emphasis added); *see also Jospeh v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020) ("For an officer's force to be reasonable, it must be commensurate with the suspect's level of contemporaneous, *active* resistance.") (emphasis added).

In support of their argument that Thomas actively resisted arrest, the Defendants cite *Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016). The circumstances of that case consisted of "a late-night traffic stop involving a clearly drunk and obstinate individual, lurching to the side and

stating 'no, no,' in the act of being handcuffed, immediately following the command to 'put your hands behind your back[.]'" *Id.* at 314. In light of those circumstances, the Fifth Circuit concluded that "[the plaintiffs'] actions would, to a reasonable police officer, amount to resistance to arrest." *Id.* The facts as recounted by Thomas are distinguishable from those in *Griggs*. Accepting his factual account as true, Thomas did not physically indicate that he was refusing a command. Further, while he told the officers not to touch him due to his medication, he did not make this statement in response to a command; instead, it was an isolated statement. When asked why he would make that statement if no officer had touched him, Thomas replied: "It's the way that they was around me. I'm talking about they was around me, and you know, I felt real funny about it." [53], Ex. 1 at p. 9. Unlike the plaintiff in *Griggs*, Thomas had complied with the officers' only instruction, did not physically resist by stepping away, and did not verbally refuse a command.

The Court finds the 2017 case of *Trammell v. Fruge*, 868 F.3d 332, more instructive. There, several officers responded to a potentially intoxicated motorcyclist (later identified as Trammel) on the side of the road. *Id.* at 336. After a brief conversation with officers, Trammel refused to walk toward the officers, answer questions, or place his hands behind his back as instructed. *Id.* at 337. Trammel specifically told the officers, "I'm not going to jail." *Id.* When an officer grabbed Trammel's right arm to arrest him, Trammel pulled away and told him that it hurt and not to grab him there. *Id.* Another officer then grabbed Trammel's left arm, and he pulled back again. *Id.* The officers then used force to arrest Trammel.

In considering the resistance factor, the Fifth Circuit noted that "[i]t is unclear at what point passive resistance becomes the sort of active resistance which justifies force." *Id.* at 341 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000)). The court ultimately

22

held that there was a factual dispute as to whether Trammel's actions constituted active resistance, emphasizing the following facts:

> [I]t appears that Trammel's only physical resistance prior to being tackled was his attempt to pull his arm away. In fact, the dash cam footage reveals that Trammel did not even use much force in pulling away from the officers; although Trammel can clearly be seen moving his arm in the opposite direction from Officer Fruge, he is only able to move it away by a few inches such that the officer's hand never lost contact with Trammel's arm. It also appears that Officer Fruge himself was not pulled forward. Trammel was neither aggressive nor violent toward the officers prior to being tackled.

*Id.* at 341-42.

Additionally, the Fifth Circuit's 2017 decision in *Hanks v. Rogers*, 853 F.3d 738, provides an example of passive resistance. There, the plaintiff questioned but complied with the officer's commands, and he took a small lateral step when the officer instructed him to "go to [his] knees." *Id.* at 742. The Fifth Circuit concluded that the plaintiff's resistance was "at most, passive" and did not justify the officer's takedown, noting that his small lateral step "was not accompanied by any obvious signs of violence or flight; Hanks did not turn his body or move his hands, which remained folded behind his back." *Id.* at 746.

Here, Thomas' actions fall below the levels of resistance seen in *Trammell* and *Hanks*. Both Trammel and Hanks argued with the officers and offered minor signs of physical resistance. Again, accepting Thomas' factual account as true, Thomas complied with the officers' request to walk with them and did not physically resist by pulling away or stepping away after a command. As they walked to the other side of the courtroom, Thomas told the officers not to put their hands on him *because he was taking medication*. In other words, Thomas—who was surrounded by officers and had not been informed of the warrant for his arrest—gave them a specific reason as to why he did not want to be touched. He did not make the statement in response to a command or

statement that he was under arrest. He further testified that he did not physically resist arrest. A jury could conclude that at the time Officer White placed Thomas in a chokehold, no reasonable officer would have believed that Thomas was actively or passively resisting arrest.

Next, the Court turns to the Defendants' suggestion that Thomas' resistance *during* the encounter justified the use of force against him. Specifically, the Defendants argue that Thomas resisted arrest when he repeatedly cussed at the officers and told them to "turn [him] loose." [53], Ex. 1 at p. 16. The Defendants contend that "[r]esisting while being handcuffed constitutes active resistance and justifies the use of at least some force." [58] at p. 4. (quoting *Hutcheson v. Dallas Cnty.*, 994 F. 3d 477, 480 (5th Cir. 2021)).

As discussed above, accepting Thomas' account as true, Officer White placed Thomas in a chokehold *before* he began cussing, wiggling, and telling them to turn him loose. Thus, at the time White placed Thomas in a chokehold, Thomas allegedly showed no signs of resistance, and overwhelming Thomas with a chokehold was an amount of force that was excessive to the need.

Officer Adams' strike did occur after Thomas began cussing, wiggling, and telling the officers to turn him loose. However, as repeatedly emphasized above, Thomas testified that the strike occurred when he was unconscious. *See* [53], Ex. 1 at p. 15. This means Thomas' cussing and wiggling, i.e., resistance, would have ceased at the point that Adams struck him. Further, Officer Adams was undisputedly present and watching the encounter and would have seen that Thomas ceased his cussing and wiggling after being in the chokehold for 10-15 seconds and telling White, "You killing me." [53], Ex. 1 at p. 29; *see Darden*, 880 F.3d at 732 (where officer had been observing encounter between arrestee and other officers, court noted that "[he] saw whether [arrestee] was resisting and saw how much force had already been used on [arrestee]. He needed to take those perceptions into account in assessing how much additional force, if any, was

necessary.") (citation omitted). A jury could conclude that a reasonable officer in Adams' position could not have believed that Thomas was resisting arrest. This factor weighs in favor of Thomas.

Lastly, before moving to the next factor, the Court feels compelled to address an additional finding from *Trammell*, relevant to the Defendants' contention that Thomas' resistance during the encounter justified the officers' use of force. While it is true that "[r]esistance while being handcuffed constitutes active resistance and justifies the use of at least some force," the amount of force used must not be excessive to the need. *Hutcheson*, 994 F.3d at 480. In *Trammell*, after Trammel twice pulled his arm away, an officer executed a knee strike to Trammel's thigh, causing him to lose his balance. 868 F.3d at 337. Another officer then placed Trammel in a headlock while several officers pulled him to the ground. *Id.* "While on the ground, the officers tried to grab hold of Trammel's arms, which were underneath him. The officers repeatedly asked Trammel to put his hands behind his back, and he apparently refused to comply." *Id.* "[Trammel] can first be heard yelling that he is a cop, and later, as the officers command him to 'stop resisting,' Trammel can be repeatedly heard yelling that his arm is fused." *Id.* While on the ground, "the officers administered knee strikes to Trammel's arms, thighs, and ribs so that they could subdue and handcuff him." *Id.* at 337-38.

In the final part of its excessive force analysis, the Fifth Circuit concluded that fact issues remained as to the reasonableness of force used after Trammel was on the ground:

> [W]e find that Trammel has independently presented a question of material fact as to whether the force used to gain control of his arms was excessive to the need. Viewing the facts in the light most favorable to Trammel, after the officers tackled him, they pummeled Trammel with their knees and fists in an attempt to get him to put his arms behind his back. Trammel contends the officers continued to do so even after he shouted that his arm was fused. Because Trammel's yelling about his arm can be clearly made out from the dash cam footage, a jury could reasonably infer that the officers heard Trammel's plea but nevertheless continued to beat him

25

> without consideration for his limited mobility and strength. Since Officer Fruge testified that Trammel never exhibited a desire to harm any of the officers, a reasonable jury could determine that, under the circumstances, the officers' decision to continue using force as objectively unreasonable.

*Id.* at 342.

Here, the Defendants argue that the officers' use of force was justified because Thomas resisted by cussing and wiggling to get loose from the chokehold, but this broad argument addresses only the need for force and not the amount of force used. As discussed above, accepting Thomas' account as true, he was not resisting prior to the chokehold or at the time of Adams' strike. However, even assuming for the sake of argument that Thomas' cussing and wiggling justified the use of some force once he was on the ground, like in *Trammell*, a reasonable jury could conclude that the force used was excessive to the need.

Similar to Trammel's statement that his arm was fused, once on the ground, Thomas indicated that he could not breathe—he told the officers, "You killing me. You killing me. You killing me." [53], Ex. 1 at p. 29. Thomas further testified that he was on his stomach with his arms behind his back, making the circumstances even less dire than in *Trammell* where the arrestee's arms were underneath him and he did not comply with commands to put his hands behind his back. And the Court finds it noteworthy that Officer McWright told Officer White to get off of Thomas. *See* [53], Ex. 1 at p. 24-25; *see Darden*, 880 F.3d at 730 (focusing on whether reasonable officer on the scene would have perceived arrestee as resisting arrest); *Tucker*, 998 F.3d at 176 (emphasizing that in evaluating the reasonableness of force, "our focus is on the officers' reasonable perception of the events at issue"). Even if Thomas was cussing and wiggling, viewing the evidence in the light most favorable to him, a jury could conclude that keeping him in a

chokehold until he lost consciousness and striking him was excessive to the need because he was already subdued by White laying on top of him while his hands were behind his back.

      *iv.*    *Speed*

     Though not included in the *Graham* factors, "the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell*, 868 F.3d at 342 (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that disputes of fact were material because "a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to'" force); *Deville*, 567 F.3d at 168 (determining that "[a] reasonable jury could infer from [the plaintiff's] deposition testimony that [the defendant officer] engaged in very little, if any, negotiation with [the plaintiff]—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle")).

     As noted above, in *Trammell*, the Fifth Circuit concluded that there was a question of fact as to whether Trammell actively resisted arrest. 868 F.3d at 341. Importantly, the court further held that "even if Trammel's decision to pull his arm away from the officers can be characterized as some degree of resistance that would justify an officer's use of force, the *quickness* with which the officers resorted to tackling [him] to the ground militates against a finding of reasonableness." *Id.* at 342 (emphasis added). Given that only three seconds elapsed between one officer's initial request that Trammel place his hands behind his back and the other officers tackling Trammel, the Fifth Circuit held that "a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required 'measured and ascending actions' calibrated to Trammel's conduct." *Id.* (quoting *Poole*, 691 F.3d at 629).

Here, the Defendants assert: "Unlike *Trammell*, more than three seconds elapsed between the time Plaintiff was placed under arrest and the time the officers used force, showing that Plaintiff's conduct was met with 'measured and ascending' actions." [58] at p. 5. At his deposition, regarding the beginning of the encounter, Thomas testified as follows:

> A. They walked over to me and asked me – I'm thinking they was saying "come over here"; so I got up and I just went to walking over there.
>
> . . .
>
> Q. . . . So what was the first thing that anybody said to you?
>
> A. They was saying something and I was like, "What's going on? What's going on?"
>
> Q. Uh-huh.
>
> A. And I was like, "Don't put your hands on me, don't put your hands on me because I take medication." And –
>
> Q. At what point did you realize they were trying to serve you with a warrant or that they had a warrant?
>
> A. I never realized it because I didn't know. And *before I knew it*, Officer White had grabbed me around my neck from the back. And I'm talking about, I'm a big dude and he's a big dude and he was choking me so bad. I couldn't get loose from him. He fell on me.

[53], Ex. 1 at p. 6-7 (emphasis added).

As Thomas recounted it, the situation quickly moved from him walking with the officers to being choked "before [he] knew it." *Id.* Thomas never testified that the officers gave him other commands. Overall, viewing Thomas' testimony in the light most favorable to him, a jury could infer that Officer White resorted to force without attempting to negotiate with Thomas first. Thus, like in *Trammell*, the quickness with which Officer White resorted to placing Thomas in a chokehold weighs against a finding of reasonableness.

As to Officer Adams, the speed at which he resorted to force is not clear. Thomas testified that he was on the ground for approximately 20 seconds and that he did not hear what (if anything) the officers told him once he was on the ground. This factor does not weigh heavily one or the other with respect to the reasonableness of Adams' strike.

Overall, viewing the facts in the light most favorable to Thomas, he has shown the existence of a constitutional violation. That is, a reasonable jury could conclude that Officers White and Adams' use of force was unreasonable and excessive under the circumstances. The first prong of the qualified immunity inquiry is satisfied.

This brings the Court to the second prong of the qualified immunity inquiry—whether the right at issue was clearly established.

## II.      Clearly Established

As noted, to overcome the defense of qualified immunity, the plaintiff must show that the official violated a statutory or constitutional right that was "clearly established at the time of the challenged conduct," which, in this case, is August 7, 2019. *Craig*, 49 F.4th at 409. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 577 U.S. at 12, 136 S. Ct. 305 (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)). This does not require a case "directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

The Supreme Court has repeatedly instructed courts not to define clearly established law at a "high level of generality." *Mullenix*, 577 U.S. at 12, 136 S. Ct. 305 (quoting *al-Kidd*, 563 U.S.

at 742, 131 S. Ct. 2074). "The dispositive question is 'whether the violative nature of *particular conduct* is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742, 131 S. Ct. 2074) (emphasis in original). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)).

Arguing that Officers White and Adams violated clearly established law, Thomas relies on *Trammell*, 868 F.3d 332 (5th Cir. 2017), which the Court has discussed at length above. In brief, engaging in the excessive force analysis, the Fifth Circuit held as follows: (1) Trammel was suspected of the minor crime of public intoxication, militating against the use of force; (2) a fact issue existed as to whether a reasonable officer would have perceived Trammel to be a danger to himself or others, as it did not appear that Trammell was intoxicated enough to stumble into the street and his motorcycle was fully parked; (3) a reasonable officer would not have believed that Trammel intended to flee, given that Trammel's comment that he was "not going to jail" was the only conduct indicating that he intended to flee; (4) a question of fact existed as to whether Trammell actively resisted arrest when he pulled his arm away; (5) the officers quickly resorted to force without negotiation; and (6) even if the use of force was justified, the amount of force used was excessive to the need. *Trammell*, 868 F.3d at 340-42. Ultimately, the court held that "a reasonable jury could find that Trammel's pulling his arms away from the officers, along with the other circumstances of Trammel's arrest, did not justify the officers' decision to tackle Trammel to the ground. Thus, there is a genuine dispute of material fact as to whether the officers' use of force was objectively unreasonable." *Id.* at 342.

Thomas additionally relies on *Goodson*, 202 F.3d 730 (5th Cir. 2000). There, two police officers stopped the plaintiff, believing that he matched the description of an individual suspected

of assault. *Id.* at 733. One of the police officers instructed the plaintiff to "put his hands on the [police] car." *Id.* at 734. The plaintiff claimed that before he could comply, the officer grabbed his arm. *Id.* The plaintiff "stated that he pulled his arm away from [the officer] in surprise and stumbled back in an attempt to regain his balance and maintain a little distance from the police officers." *Id.* Thereafter, the plaintiff claimed the two officers together tackled him to the ground and broke his shoulder. *Id.* The Fifth Circuit did not describe the plaintiff's decision to pull his arm away and walk backwards as resistance or flight. *Id.* Instead, in reversing the district court's summary judgment based on qualified immunity, the Fifth Circuit held that a fact question "exist[ed] as to the objective reasonableness of the force used" because fact issues remained as to whether the officers had reasonable suspicion to initiate the stop in the first place. *Id.*

The *Trammell* court relied on *Goodson* in two instances. First, recall that in *Trammell*, the Fifth Circuit concluded that there was a question of fact as to whether Trammel actively resisted arrest when he pulled his arm away from the officers. 868 F.3d at 341. In reaching that conclusion, the Fifth Circuit specifically noted that the *Goodson* court did not describe the *Goodson* plaintiff's decision to pull his arm away as resisting arrest. 868 F.3d at 341.

Second, in *Trammell*, the Fifth Circuit concluded that *Goodson* gave the officers "fair warning" that their conduct was unconstitutional. *Id.* at 343. Noting the distinction between the cases—*Goodson* focused on lack of reasonable suspicion, while *Trammell* focused on the question of fact as to Trammel's resistance—the Fifth Circuit described the distinction as "merely a matter of degree." *Id.* The court determined that the issue of reasonable suspicion in *Goodson* went to the "severity of the crime" factor and emphasized that the factual scenarios were otherwise "very similar;" both cases "involve a plaintiff who was tackled by officers after very minimal physical resistance—pulling away from an officer after the officer grabbed the plaintiff's arm." *Id.* As such,

the court held that "the law at the time of Trammel's arrest clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Id.*

Next, the Court finds pertinent the 2017 case of *Hanks v. Rogers*, 853 F.3d 738, briefly discussed above. There, the plaintiff, Marcus Hanks, was pulled over by Officer Rogers for driving too slowly. *Id.* at 741. Hanks questioned but ultimately complied with Rogers' commands to exit the vehicle, take his hands out of his pockets, and place his hands on the vehicle. *Id.* at 742. During these exchanges, Officer Rogers aimed his taser at Hanks. *Id.* Seconds after Hanks placed his hands on the vehicle, Officer Rogers instructed Hanks to put his hands behind his head, which he did. *Id.* As soon as Hanks' hands reached the back of his head, Officer Rogers instructed him to "go to [his] knees." *Id.* In response, Hanks looked over his shoulder and asked, "For what?" *Id.* "Hanks simultaneously moved his hands to his rear, so that they were folded behind his back with his empty palms facing Officer Rogers." *Id.* The two then went back and forth, with Officer Rogers repeating his command to kneel and Hanks twice asking whether he was under arrest. *Id.*

After Hanks asked for a second time whether he was under arrest, Officer Rogers repeated his command for Hanks to kneel and Hanks made a small lateral step with his left foot. *Id.* Throughout this exchange, Hanks' empty hands remained behind his back and visible to Officer Rogers. *Id.* at 742-43. "Almost simultaneously with Hanks's small step, Officer Rogers rushed toward Hanks and administered a blow to Hanks's upper back or neck[.]" *Id.* at 743. "The blow forced Hanks's upper body onto the trunk of his vehicle. Officer Rogers maintained contact with Hanks as Hanks shifted to the ground," where he laid face-down with his hands behind his back. *Id.* He was arrested without resistance. *Id.* Hanks later sought medical care and was diagnosed with a contusion, strain, and acute myofascial strain. *Id.*

Considering the *Graham* factors, the Fifth Circuit held that Hanks was stopped for a minor traffic violation, weighing against the use of force. *Id.* at 745. Holding that a reasonable officer would not have perceived Hanks as an immediate safety threat, the court noted that Hanks' hands remained visible to the officer for most of the interaction. *Id.* at 746. The court further emphasized that Hanks' "at most, passive" resistance "consisted chiefly of remaining on his feet for about twenty seconds after Officer Rogers' first order to kneel, during which time Hanks asked twice whether he was under arrest." *Id.* And while Hanks did make a small lateral step with his left foot, the step was not accompanied by any obvious signs of violence or flight. *Id.* In light of these circumstances, the Fifth Circuit concluded that Officer Rogers' takedown was clearly excessive and unreasonable. *Id.* The court further held that "on the night Officer Rogers stopped Hanks [February 26, 2013], clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and who the officer stopped for a minor traffic violation." *Id.* at 747 (citing *Deville*, 567 F.3d at 167-69).

Lastly, the Court finds *Sam v. Richard*, 887 F.3d 710 (5th Cir. 2018) instructive. There, Plaintiff Jamarcus Sam, a 16-year-old, went to Walmart with a group of his friends. *Id.* at 712. While there, "the group split up and browsed until one of Sam's friends got into an argument with another girl." *Id.* "The group left the store, and one of Sam's friends, Eddie Stag, stole a jacket." *Id.* Officer Richard was dispatched to respond to the reported theft. *Id.* When he encountered Sam's group nearby the Walmart, he activated his emergency lights and the group scattered and ran. *Id.* "After a short chase, another officer saw Sam and Stag, and threatened to release a dog if the boys didn't stop running. Sam lay face down on the ground and put his hands on the back of his head."

*Id.* Officer Richard then slapped Sam across the face, kneed him, placed him in handcuffs, and shoved him against a police car while detaining him. *Id.*

The district court concluded that Sam's injuries—minor bleeding and bruising—were *de minimis* and could not support an excessive force claim. *Id.* at 713. The Fifth Circuit reversed, noting that "even insignificant injuries may support an excessive force claim, as long as they result from unreasonably excessive force." *Id.* (citation omitted). Holding that Sam's injuries did result from objectively unreasonable force, the court emphasized that Sam initially ran from the officers but "he was lying face down on the ground with his hands on his head when Richard kneed him in the hip and pushed him against a patrol car. Such a use of force on a compliant suspect is excessive and unreasonable." *Id.* (citing *Alexander*, 854 F.3d at 309 (although suspect refused to exit vehicle, once he was removed it was objectively unreasonable to throw the suspect on the ground, knee him in the back, and push his face into the ground)). The Fifth Circuit further held that "it was clearly established at the time of this incident [February 10, 2015] that pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive." *Id.* (citing *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (holding use of force was objectively unreasonable where officers slammed arrestee's face into vehicle after she was handcuffed and had ceased resistance)) (additional citations omitted).

The Court finds that *Trammell*, *Hanks,* and *Sam* provided "fair warning" to Officers White and Adams that their conduct violated the Fourth Amendment. *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016). The Court is cognizant that there are some notable factual distinctions between these cases and the case *sub judice*. Namely, the "severity of the crime" factor weighed more heavily against the use of force in the cited cases, and the types of force used in the cited cases were not identical the chokehold used against Thomas. However, "[t]he law can be clearly

34

established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (quoting *Newman*, 703 F.3d at 763).[11] And "[l]awfulness of force. . . does not depend on the precise instrument used to apply it. Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel." *Id.* at 525. The Fifth Circuit in *Trammell*, *Hanks*, and *Sam* heavily emphasized the arrestees' minimal or nonexistent physical resistance at the time force was used, coupled with the officers' "abrupt[] resort to overwhelming physical force." *Hanks*, 853 F.3d at 747. As discussed at length above, accepting Thomas' version of events as true, he offered less (if any) resistance than the verbal and physical signs of resistance at issue in *Trammell* and *Hanks*. Like the officers in *Trammell* who abruptly placed Trammel in a headlock and tackled him to the ground, Officer White abruptly placed Thomas in a chokehold, causing him to strain and fall forward onto the ground. Further, like the officers in *Trammel* who continued to use force while Trammel was on the ground and shouting that his arm was fused, Officers White and Adams used force against Thomas after he told the officers they were killing him. Due to these factual similarities, on August 7, 2019, clearly established law demonstrated that it was unreasonable and excessive (1) for Officer White to abruptly choke Thomas until he was unconscious after he had

---

[11] The Defendants argue that *Trammell* and *Goodson* (as well as Thomas' other cited cases that the Court has not discussed) are insufficiently similar to this case and therefore do not clearly establish that White and Adams' conduct was unconstitutional. The Defendants instead contend that *Solis v. Serrett*, 31 F.4th 975, 979 (5th Cir. 2022), (where the officers' use of force was reasonable) is more factually analogous to the case *sub judice* because it involved an arrestee who "fell to the ground, either from the officers forcing her down or from the momentum as she struggled." Unlike Thomas, the arrestee in *Solis* was hostile from the beginning of the encounter and stepped back from the officer after he indicated she was under arrest. *Id.* The Defendants further allege that *Craig v. Martin*, 49 F.4th 404, 411 (5th Cir. 2022) is more analogous to this case because the officer there pushed the arrestee to the ground while maintaining a hold on her arm as she descended. While making the arrest, the officer in *Craig* was pushed from behind, jostled, and shouted at by the arrestee's teenage children who were trying to separate her from the officer. *Id. Solis* and *Craig* do not change the Court's finding that Officers White and Adams' use of force violated clearly established law.

complied with the officers' only command and displayed no signs of resistance, and (2) for Officer Adams to strike Thomas in the head when Thomas was unconscious with his hands behind his back.

The Court feels compelled to note, as it noted at the outset, that the facts of this case are heavily disputed. The parties present conflicting evidence on a number of material facts, including what Thomas said or did prior to the officers' use of force and what transpired once Thomas was on the ground. A jury may ultimately conclude that Thomas resisted arrest by cussing at and shoving Officer Tucker or reaching for Officers Adams' gun. Under those facts, the officers' use of force might have been reasonable. However, the Court's role at this stage is not to make credibility determinations or weigh the evidence in order to resolve these factual disputes. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the Court must accept Thomas' evidence as true and draw all reasonable inferences in his favor when determining whether a genuine issue of material fact requires submission to a jury. *See id.*, 106 S. Ct. 2505. On the record before the Court, there are genuine disputes of material fact as to whether Officers White and Adams used objectively unreasonable and clearly excessive force. Therefore, they are not entitled to qualified immunity.

*Conclusion*

For the reasons set forth above, the Defendants' Motion for Summary Judgment [49] is DENIED. Thomas will be permitted to proceed to trial.

SO ORDERED, this the 26th day of September, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE